*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

COREY HOLMES,

Defendant-Appellant.

UNPUBLISHED
August 18, 2025
12:00 PM

No. 367177
Wayne Circuit Court
LC No. 19-000537-02-FC

Before: REDFORD, P.J., and RIORDAN and BAZZI, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of first-degree premeditated murder, MCL 750.316(1)(a); conspiracy to commit first-degree premeditated murder, MCL 750.157a and MCL 750.316(1)(a); and retaliating against a witness, MCL 750.122(8). Defendant was sentenced to life in prison without the possibility of parole for his first-degree premeditated murder conviction, life in prison without the possibility of parole for his conspiracy to commit first-degree premeditated murder conviction, and 6 to 10 years' imprisonment for his retaliating against a witness conviction. We affirm.

## I. FACTUAL BACKGROUND

This case involves the murder of the victim following her preliminary-examination testimony in relation to a carjacking incident that occurred at a BP gas station in Harper Woods, Michigan. The carjacking occurred in early September 2018. In the immediate aftermath of the carjacking, the police were able to track the victim's cell phone, which was still in the stolen car. The police found the stolen car and chased down a man who was seen running away from the car. That man was later identified as Kenneth Dixon.[1] The victim identified Dixon as the perpetrator

---

[1] Dixon and defendant were codefendants, but the court severed their cases and they were tried separately. Dixon was convicted of several crimes in relation to the carjacking and murder of the victim. His convictions and sentences were affirmed on appeal. *People v Dixon*, unpublished per curiam opinion of the Court of Appeals, issued July 25, 2024 (Docket Nos. 364043 and 364045).

of the carjacking that night. A black cell phone was also found in the area where the police chase occurred. The police did not encounter defendant in the area.

Following the incident, police officers found surveillance video footage from the night of the carjacking. The footage showed a red Dodge Challenger at the restaurant where the victim and her boyfriend, Joseph Rogers, had dinner earlier in the evening. A red Challenger was also seen at an apartment complex near the BP gas station. A red Challenger was also found parked across from the stolen car after the carjacking, and it was later determined that the vehicle was registered to Dixon. Dixon later admitted during a police interview that his red Challenger was the vehicle seen in the surveillance footage.

At the time of the incident, Jah-Lana Streeter and Dixon were romantic partners and lived together. On the night of the carjacking incident, Dixon was supposed to pick Streeter up from work, but he never appeared. Earlier that night, Streeter saw defendant and Dixon together in Dixon's red Challenger. The next day, Streeter learned Dixon was incarcerated. After speaking with Dixon, she found the keys to his Challenger near Moross Street, which was near where Rogers's vehicle was found in Detroit, Michigan. Dixon's sister took the keys, and the Challenger registered to Dixon was later found at the home of Dixon's sister.

A few days after the incident, Rogers, who was the owner of the stolen vehicle, began receiving phone calls on his cell phone from a male caller using a private line. The man offered Rogers $500 in exchange for the victim's refusal to appear in court at Dixon's upcoming preliminary examination for the carjacking. Rogers declined the money. Nevertheless, the man continued to call Rogers. In the phone calls, the caller insisted that the wrong individual was arrested for the carjacking. After additional phone calls, Rogers eventually agreed to meet the man at the corner of Puritan and Livernois, in Detroit, to exact revenge on the man. However, the man never confirmed the meeting, so Rogers did not appear.

While incarcerated, Dixon made several jail calls to Streeter and defendant that are relevant to this case. During a September 24, 2018 call, the group discussed "[p]aying the lawyer," which Streeter explained at trial meant they were going to pay off Rogers and the victim not to come to court in relation to the carjacking case against Dixon. The group used the code word "lawyer" because they knew the jail calls were recorded. Dixon indicated that "everything gonna be good with that lawyer," which Streeter understood to mean Rogers would be paid.

On September 25, 2018, another telephone call occurred between Dixon and Streeter in which they discussed defendant's intention to take Rogers the money. However, the two discussed that there was an issue getting the money to Rogers because defendant had transportation issues. Defendant was either on the call originally or joined the call. He then stated that he was supposed to meet someone at "Livernois and Puritan."

The preliminary examination in the carjacking matter against Dixon was initially scheduled for September 26, 2018. The victim failed to appear. The next preliminary examination date occurred on or about October 3, 2018. This time, the victim appeared and testified against Dixon, identifying him as the perpetrator. Rogers was never subpoenaed to testify against Dixon.

Later that day, Streeter visited Dixon in jail. Dixon was very angry that the victim testified and that he was bound over on the charges. According to Streeter, Dixon "wanted her gone," referring to the victim. Streeter believed this meant Dixon wanted the victim killed. Dixon, Streeter, and defendant created a plan to kill the victim. Defendant was the individual who would carry out the murder. In early October 2018, Dixon gave Streeter the victim's address through the mail. It is unclear how Dixon found the victim's address. Streeter lost that letter, so Dixon mailed her a second letter. Streeter gave the second letter to defendant on October 8, 2018. After Streeter gave defendant the letter, defendant told Streeter "[t]hat he was going to go take care of it that night[.]" The two also spoke with Dixon again on the telephone that evening. During that call, defendant stated, "I'm trying to take care of it tonight[.]" Streeter understood defendant to be talking about killing the victim.

On October 9, 2018, at approximately 8:00 a.m., Rogers and the victim were at the victim's house in Detroit. The victim saw her son off for school, and then she and Rogers began walking toward their cars, which were parked in the backyard. Rogers heard a gunshot. He turned toward the gunfire and heard the victim scream. He then saw someone wearing all black, including a black hood, standing near the garage shooting at them. The victim and Rogers began running down the driveway, and then Rogers heard the victim fall. Rogers looked back and saw the man standing over the victim. The man shot the victim in the head and then ran through the backyard. Rogers, who was distraught, ran for help and saw the same man walking up a side street.

The police arrived a short time later and collected seven nine-millimeter Luger handgun shell casings from the scene. Also, the handle of a garbage can near the garage of the home (known as a Courville container) was swabbed for fingerprints and DNA. The garbage can appeared to have been moved recently and there was a "dirt spot" where it appeared the garbage can was placed before. Rogers described the shooter and gave the police his cell phone for further analysis. An autopsy revealed the victim suffered 12 gunshot wounds to various parts of her body.

On the same day as the victim's death, defendant came to Streeter's house sometime after 8:00 a.m. He was wearing all black. He stated, "Tell bro that it's done." Streeter took this to mean that the victim was killed. Defendant indicated he waited until the victim took her son to school to shoot her. He then asked Streeter to take him to the scene. They drove by the area but did not get close to the scene. Streeter was later arrested and accepted a plea agreement in exchange for her testimony. Her credibility was explored in detail at trial.

At some point after the murder, defendant was taken into custody. When defendant was arrested, he was in the rear passenger seat of a car, and there were two other people inside the car. A cell phone was found underneath defendant on the seat. This phone and the one found near where Roger's car was found after the carjacking were both analyzed. Both phones had defendant's name as the "user," and shared some of the same text messages. Additionally, some of the text messages found in the phone recovered when defendant was arrested referred to "Corey." The phone also had text messages with someone named "Lana Scoop," which discussed paying the lawyer.

An analysis of cell phone records received from several cell phone carriers revealed that a phone number associated with defendant called Rogers's phone several times on September 24 and 25, 2018, and sent Rogers a text message. The cell phones communicated a total of 14 times

on those dates. Defendant's cell phone also communicated with Dixon's cell phone several times near the former Eastland Mall on the night of the carjacking. The analysis also revealed communication between Streeter and defendant on the morning of the victim's murder.

Following the victim's murder, the police also went door-to-door to ask the victim's neighbors whether they had cameras attached to the outside of their homes. Police were able to find a video from the surveillance system of a house directly behind the victim's home showing that at approximately 8:07 a.m., a man wearing dark clothing walked up a side street and then turned on a street near the victim's home. A forensic analysis was performed on the DNA sample from the handle of the Courville container, which contained the DNA of two individuals. When compared with the DNA sample defendant provided after his arrest, the forensic analysis revealed that "it [was] at least 40 octillion times more likely if the DNA had originated from [defendant] and one unknown unrelated individual rather than if the DNA had originated from two unrelated unknown individuals." It did not appear that a secondary DNA transfer occurred because there was an ample amount of DNA on the handle.

Defendant was charged with first-degree premediated murder; conspiracy to commit first-degree premediated murder; witness intimidation by committing a crime or threatening to kill or injure, MCL 750.122(7)(c);[2] retaliating against a witness; being a felon in possession of a firearm (felon-in-possession), MCL 750.224f; and carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The parties stipulated at trial that defendant had a prior felony conviction and, at the time of the shooting, had not met the requirements to regain his right to lawfully possess a firearm. The defense did not present any witness testimony or other evidence. As discussed later, defendant takes issue with several questions and statements the court made at trial.

The jury found defendant guilty of first-degree premeditated murder, conspiracy to commit first-degree premeditated murder, and retaliation against a witness, as indicated earlier. However, the jury acquitted defendant of felon-in-possession and three counts of felony-firearm. Defendant was sentenced as stated earlier. This appeal followed.

II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues his conviction of first-degree premeditated murder was inconsistent with his acquittal on the related weapon charges. Then, premised on his argument regarding the alleged inconsistent verdicts, defendant argues insufficient evidence supported his convictions. We note that defendant has raised these distinct legal issues as one issue. We disagree with both arguments.

Defendant's inconsistent-verdict argument is not preserved for appellate review. To preserve an inconsistent-verdict issue for appellate review, the defendant must object in the trial court. *People v Montague*, 338 Mich App 29, 50; 979 NW2d 406 (2021). Defendant did not raise

---

[2] The court dismissed this charge on defendant's motion for a directed verdict.

an objection to the jury verdict in the trial court, and instead raises the issue for the first time in his brief on appeal. Therefore, the inconsistent-verdict aspect of this issue is not preserved. See *id*.

We review an unpreserved challenge to an inconsistent verdict for plain error affecting the defendant's substantial rights. *Id*. "Defendant must demonstrate that an error occurred, the error was plain, and the plain error affected his substantial rights." *Id*. The third element requires the defendant to demonstrate prejudice, "which occurs when the error affected the outcome of the lower court proceedings." *Id*. (quotation marks and citation omitted). "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999) (quotation marks and citation omitted; alteration in original).

We review de novo defendant's broader challenge to the sufficiency of the evidence. *People v Solloway*, 316 Mich App 174, 180; 891 NW2d 255 (2016). "This Court must determine whether the evidence was sufficient to justify a rational trier of fact's conclusion that the evidence proved the essential elements of the crime beyond a reasonable doubt." *Id*. In deciding this issue, we will not interfere with the role of the jury, as the finder of fact, to decide the credibility of the witnesses. *Id*. "All conflicts in the evidence must be resolved in favor of the prosecution, and circumstantial evidence and all reasonable inferences drawn therefrom can constitute satisfactory proof of the crime." *Id*. at 180-181.

## A. INCONSISTENT VERDICTS

The verdicts in a criminal case are inconsistent if the verdicts "cannot rationally be reconciled." *Montague*, 338 Mich App at 51 (quotation marks and citation omitted). "Inconsistent verdicts within a single jury trial are permissible, and do not require reversal absent a showing of confusion by the jury, a misunderstanding of the instructions, or impermissible compromises." *Id*. The defendant has the burden to make this showing. *Id*. The defendant cannot rely on the mere inconsistency in the verdicts to support his or her position. *Id*. Additionally, "[j]uries are not held to any rules of logic nor are they required to explain their decisions." *Id*. (quotation marks and citation omitted). As our Supreme Court explained, "Because the jury is the sole judge of all the facts, it can choose, without any apparent logical basis, what to believe and what to disbelieve. What may appeal to the judge as undisputed need not be believed by a jury." *People v Vaughn*, 409 Mich 463, 466; 295 NW2d 354 (1980) (quotation marks and citation omitted).

In *Vaughn*, the defendant was convicted of felonious assault, MCL 750.82, but acquitted on a related felony-firearm charge. *Id*. at 464-465. The Michigan Supreme Court explained, without relying on the specific facts of the case, that the jury may decide to be lenient, and the fact that the jury decided to show leniency should not serve as the basis for a dismissal of the charges. *Id*. at 466. The Court also noted that because of differences in the language of the two statutes, the jury verdicts may not have been factually inconsistent because the jury may have believed the defendant used another type of dangerous weapon. *Id*. at 467. See also *People v Lewis*, 415 Mich 443, 446; 330 NW2d 16 (1982) (upholding the defendants' felony-firearm convictions when they were acquitted of the underlying felonies in each case).

A conviction of first-degree premeditated murder requires the prosecution to establish beyond a reasonable doubt that the defendant committed "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (quotation marks and citation omitted; alteration in original). The elements of first-degree murder include (1) the intentional killing of another human, and (2) premeditation and deliberation. *Id*. To establish felony-firearm, the prosecution must establish that the defendant possessed a firearm during the commission of a felony, or the attempted commission of a felony. *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999). Felon-in-possession criminalizes the possession of a firearm within three to five years of probation discharge following completion of the defendant's incarceration, successful completion of the period of probation, and payment of all required fines. *People v Dillard*, 246 Mich App 163, 170; 631 NW2d 755 (2001). In this case, the parties stipulated that defendant had a prior felony conviction and, at the time of the shooting, he had not met the requirements to regain his right to lawfully possess a firearm.

Defendant challenges as inconsistent his conviction of first-degree premeditated murder and his acquittal of felony-firearm and felon-in-possession. He argues the jury could not find that defendant was the shooter while also finding that he did not possess a firearm. Even if we assume the verdicts were factually inconsistent, defendant is not entitled to any relief on the basis of an alleged inconsistency in the verdicts because juries are permitted to reach inconsistent verdicts. See *Montague*, 338 Mich App at 51. Defendant does not offer any evidence to show that there was juror confusion, that the jury misunderstood its instructions, or that there was an impermissible compromise that occurred in relation to the verdict, which is the only basis on which this Court may grant relief for inconsistent verdicts. See *id*. The jury is not required to explain its decision, and the fact that the jury may have shown defendant some leniency on the weapon charges cannot form the basis for relief. See *id*. We also find this case analogous to *Vaughn*, 409 Mich at 466, in which our Supreme Court held that an acquittal of felony-firearm did not mandate a reversal of the underlying felony conviction, in part because the jury was able to show the defendant leniency. Therefore, defendant has not established a plain error warranting relief.

## B. SUFFICIENCY CHALLENGES

As for defendant's broader challenge to the sufficiency of the evidence, defendant's argument on appeal focuses on his first-degree premeditated murder conviction, but relates more specifically to the element of identity, which is an element of every crime. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). We will therefore analyze the sufficiency of the evidence to support each of defendant's convictions.

We begin our analysis with the first-degree premediated murder and conspiracy convictions. Regarding the premeditation and deliberation element of first-degree premeditated murder, in addition to lying in wait, which is expressly mentioned in the statute, a conviction of first-degree premeditated murder involves "any other willful, deliberate, and premeditated killing." MCL 750.316(1)(a). The Michigan Supreme Court has explained that "[t]o premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Oros*, 502 Mich at 240 (quotation marks and citation omitted; alteration in original). As our Supreme Court has explained "[t]he question is whether the evidence introduced at the trial fairly supports an inference of premeditation and deliberation." *Id*. at 242 (quotation marks and citation

omitted; alteration in original). Premeditation and deliberation are established by examining the time between the initial homicidal thought and the action, and specifically whether there was time for a reasonable person to give the nature of his actions a "second look." *Id*. (quotation marks and citation omitted). It is the decision of the fact-finder whether there was enough time for a reasonable person to subject his actions to a second look. *Id*. There is no specific time frame required, and the time for establishing premeditation and deliberation may only be a matter of seconds. *Id*. at 242-243. The time required for a second look depends on the circumstances of each case. *Id*. at 243-244. Additionally, premeditation and deliberation may be established through circumstantial evidence and reasonable inferences from the evidence. *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008).

"A criminal conspiracy is a partnership in criminal purposes, under which two or more individuals voluntarily agree to effectuate the commission of a criminal offense." *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011). "The individuals must specifically intend to combine to pursue the criminal objective, and the offense is complete upon the formation of the agreement." *Id*. The coconspirators must share the intent and knowledge. *Id*. The prosecution must establish that "the parties specifically intended to further, promote, advance, or pursue an unlawful objective." *Id*. (quotation marks and citation omitted). The proof of the conspiracy may be indirect and circumstantial. *Id*.

Sufficient evidence supported both the first-degree premediated murder conviction and the conspiracy conviction. A crime can be established beyond a reasonable doubt through circumstantial evidence. *People v Parkinson*, 348 Mich App 565, 575; 19 NW3d 174 (2023). There is no dispute for purposes of this appeal that the victim was intentionally killed. Her autopsy revealed she suffered 12 gunshot wounds, including three to the head, three to the chest, and others in various parts of her body. The evidence also supported that the shooter was lying in wait behind a garbage can, and continued shooting at the victim even after she fell.

For purposes of the second element of first-degree premeditated murder, sufficient evidence supported a finding that the shooter was not only lying in wait, but also acted with premeditation and deliberation, meaning that the shooter had sufficient time to subject the nature of his actions a "second look." Rogers testified he saw someone wearing all black, including a black hood, standing near the garage shooting at him and the victim. Rogers heard numerous gunshots. The victim and Rogers began running down the driveway, and then Rogers heard the victim fall. Rogers looked back and saw the man standing over the victim. The man shot the victim in the head and then ran through the yard. This evidence supported that the perpetrator had time to take a second look and was corroborated by the ample evidence, discussed later, that the murder was planned.

Regarding defendant's identity as the shooter, DNA evidence tied defendant to the shooting. At trial, there was expert testimony that the DNA sample from the garbage can handle was "at least 40 octillion times more likely" to have originated from defendant and one other person than if the DNA originated from two unknown individuals. The DNA evidence was "very strong support" that defendant contributed to the DNA found on the handle. Additionally, a "dirt spot" existed near where the garbage can was found, which gave rise to a reasonable inference the garbage can was recently moved and supported that defendant's DNA was recently placed on the handle.

Other circumstantial evidence supported defendant's identity as the perpetrator of the victim's murder. There was evidence that defendant participated in a carjacking of the victim approximately a month before her murder. For example, Streeter saw defendant and Dixon earlier on the evening of the carjacking, and they were riding in Dixon's red Challenger. The police were able to locate Rogers's car and chased down Dixon, who was running from an area near the car. A black cell phone was found in the area where the police chase occurred, and the cell phone looked out of place because it was clean and the surroundings were dirty. A cell phone record analysis revealed defendant's cell phone and Dixon's cell phone communicated that evening and were in the area of the carjacking. Although the police did not find defendant near the scene of the carjacking or where Rogers's car was found, an analysis of the cell phone found in the area revealed that it shared the same number and some of the same contents as a cell phone found underneath defendant when he was arrested. Additionally, video footage from the night of the carjacking showed a red Challenger at both the restaurant and the gas station, and a red Challenger titled to Dixon was found parked on the opposite side of the street from Rogers's car. This circumstantial evidence tied defendant to the earlier carjacking and explained why defendant and Dixon were motivated to prevent the victim from testifying as a witness at Dixon's preliminary examination.

Streeter's testimony also supported defendant's identification as the perpetrator, as well as a finding of premeditation and deliberation. Streeter explained that while incarcerated, Dixon made several jail calls to her and defendant regarding the victim. Streeter explained that the initial plan was to pay off Rogers and the victim so they would not testify against Dixon in the carjacking case. During a September 24, 2018 call (which occurred a couple of days before the victim was scheduled to testify initially), they discussed "[p]aying the lawyer," which Streeter explained at trial meant they were going to pay off Rogers and the victim not to come to court. On September 25, 2018, another telephone call occurred between Dixon and Streeter in which they discussed that there was an issue getting the money to Rogers because defendant had transportation issues. Defendant was either on the call originally or joined the call. He then stated that he was supposed to meet someone at "Livernois and Puritan," which corresponded with Rogers's testimony that he received several calls from an unknown individual and agreed to meet that person in the same location. Detroit Police Sergeant Robert Skender's analysis revealed that a phone number associated with defendant called Rogers's phone several times on September 25, 2018, and sent Rogers a text message. The two cell phones communicated a total of 14 times within the relevant period. Also, defendant's and Streeter's cell phones communicated during the morning of the victim's murder.

This plan was unsuccessful, and the victim testified during the preliminary examination on October 3, 2018. Later that day, Streeter visited Dixon in jail. Dixon was very angry that the victim testified and that he was bound over on the charges. According to Streeter, Dixon "wanted her gone," referring to the victim. Streeter believed this meant Dixon wanted the victim killed. Dixon, Streeter, and defendant discussed a plan to kill the victim. Dixon gave Streeter the victim's address through the mail. Streeter gave the letter containing the victim's address to defendant. Later that evening, Streeter picked up defendant and went to Streeter's house. Streeter gave defendant the victim's address. Defendant told Streeter "[t]hat he was going to go take care of it that night[.]" The two also spoke with Dixon again on the telephone that evening. During the call, defendant stated, "I'm trying to take care of it tonight[.]" Streeter understood defendant to be

talking about killing the victim. Dixon said, "[A]s long as everybody is getting everything together about the lawyer[.]" However, the plan was no longer to pay off Rogers, but instead, to kill the victim. Defendant's brother picked him up from Streeter's home right after the call.

On October 9, 2018, at approximately 8:00 a.m., Rogers and the victim were at the victim's house. The victim saw her son off for school, and then she and Rogers began walking toward their cars, which were parked in the backyard. Rogers heard gunshots, and then saw someone wearing all black and a black hood standing near the garage and shooting at them. The two began running down the driveway, and then Rogers heard the victim fall. Rogers looked back and saw the man standing over the victim. The man shot the victim in the head and then ran through the yard. A surveillance camera on a neighboring home caught a figure in all black walking from the alleyway behind the victim's home.

On the same day as the victim's death, defendant came to Streeter's house sometime after 8:00 a.m. Streeter went outside to speak with him. As with the shooter, defendant was wearing all black. He stated, "Tell bro that it's done." Streeter took this to mean that the victim was killed. Defendant stated that he waited until the victim took her son to school to shoot her, which also supported that he had ample time to take a second look. Defendant then asked Streeter to take him to the crime scene, and she agreed. The two went to the area of the shooting but did not get close to the scene. This evidence, when combined with the cell phone data, the DNA evidence, and the other circumstantial evidence, was sufficient to establish defendant's identity as the shooter. The evidence also supported that defendant planned the victim's murder with Dixon and Streeter in retaliation for her decision to testify at Dixon's preliminary examination in the carjacking case, which supported a finding of premeditation and deliberation. Considered as a whole and in the light most favorable to the prosecution, this evidence was enough to establish identity and the elements of first-degree premediated murder beyond a reasonable doubt. We note that while Streeter's credibility was questioned throughout trial, it was the role of the jury to determine whether Streeter's testimony was credible. *Solloway*, 316 Mich App at 180.

As for conspiracy to commit first-degree premeditated murder, the evidence supported that defendant engaged in a criminal conspiracy by voluntarily agreeing to effectuate the commission of the victim's murder. The numerous telephone calls and statements defendant made to Streeter and Dixon both before and after the victim's murder supported that defendant had specific intent to collaborate with Dixon and Streeter to pursue the crime. The conspiracy was committed upon the formation of the agreement. See *Jackson*, 292 Mich App at 588.

To the extent defendant is challenging his conviction of retaliation against a witness, sufficient evidence also supported this conviction. It is a crime to retaliate, attempt to retaliate, or threaten to retaliate against another person for having been a witness in an official proceeding. See MCL 750.122(8); *People v Greene*, 255 Mich App 426, 437; 661 NW2d 616 (2003). Retaliation is defined to mean to "[c]ommit or attempt to commit a crime against any person," or to "[t]hreaten to kill or injure any person or threaten to cause property damage." MCL 750.122(8)(a) and (b). The phrase "official proceeding" is defined to mean "a proceeding heard before a legislative, judicial, administrative, or other governmental agency or official authorized to hear evidence under oath, including a referee, prosecuting attorney, hearing examiner, commissioner, notary, or other person taking testimony or deposition in that proceeding." MCL 750.122(12)(b).

The evidence supporting defendant's first-degree murder conviction also supported that defendant killed the victim in retaliation for her having been a witness in the preliminary examination in Dixon's carjacking case. Specifically, Streeter testified that after the victim testified against him, Dixon was very angry. Through a series of jail calls, Dixon, Streeter, and defendant came up with a plan to murder the victim because she testified at Dixon's preliminary examination. Dixon sent Streeter the victim's address, and the group spoke the night before the murder. During that call, defendant stated, "I'm trying to take care of it tonight[.]" As noted earlier, the next day, defendant came to Streeter's house and told her, "Tell bro that it's done." There is no dispute that the preliminary examination was a proceeding before a judicial official authorized to hear evidence under oath, and therefore qualified as an official proceeding. These facts supported that defendant murdered the victim on Dixon's behalf and in retaliation for her having been a witness at Dixon's preliminary examination. Therefore, sufficient evidence supported each of defendant's convictions.

## III. JUDICIAL BIAS

Defendant next argues the trial court exhibited bias throughout the trial, which deprived defendant of his right to a fair and impartial trial. We disagree.

A defendant preserves a claim of judicial bias by raising an objection in the trial court. *Jackson*, 292 Mich App at 597 Defendant did not raise his judicial-bias claim at any point in the trial court. Therefore, the issue is unpreserved. See *id*.

Generally, we review de novo the constitutional question whether judicial misconduct deprived the defendant of a fair trial. *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). However, because defendant failed to preserve the issue, we review his forfeited claims of judicial bias for plain error affecting his substantial rights. *Jackson*, 292 Mich App at 597. Judicial bias is a structural error. *Stevens*, 498 Mich at 168. In the case of forfeited structural errors, the Michigan Supreme Court recently explained that the error is subject to a modified plain-error analysis, in which the defendant who demonstrates a plain error need not show outcome-determinative prejudice. *People v Davis*, 509 Mich 52, 74; 983 NW2d 325 (2022). The Court explained, "[T]he existence of a forfeited structural error alone satisfies the third prong of the plain-error standard." *Id*. Unlike in other contexts, the existence of a forfeited structural error creates a formal, rebuttable presumption that the plain error seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of the defendant's innocence. *Id*. at 75.

A defendant has a constitutional right to a neutral trial judge. See *People v McDonald*, 303 Mich App 424, 437; 844 NW2d 168 (2013). There is "a heavy presumption" that the trial judge is impartial. *Jackson*, 292 Mich App at 598 (quotation marks and citation omitted). "A trial judge's conduct deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality." *Stevens*, 498 Mich at 170. "A judge's conduct pierces [the] veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171.

While a single instance of inappropriate conduct may not give an appearance of partiality, a single instance may be so egregious that it does pierce the veil of judicial impartiality. *Id.* We will not evaluate the errors in isolation, but should consider the cumulative effect of the errors. *Id.* at 171-172. When viewing the context of the case, the reviewing court should consider a variety of factors within the totality of the circumstances, which include

> the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. [*Id.* at 172.]

"[T]he aggrieved party need not establish that each factor weighs in favor of the conclusion that the judge demonstrated the appearance of partiality for the reviewing court to hold that there is a reasonable likelihood that the judge's conduct improperly influenced the jury." *Id.*

The nature of the conduct is the starting point for the reviewing court's analysis. *Id.* Judicial misconduct may include belittling counsel, inappropriate witness questions, biased commentary in front of the jury, or improper strategic advice to one party. *Id.* at 172-173. Regarding judicial questioning, the trial court's goal should be to clarify, but the court may generally question witnesses under MRE 614(b), which allows the court to examine a witness. *Id.* at 173. The court may question witnesses "to produce fuller and more exact testimony or elicit additional relevant information." *Id.* However, the judge cannot "exhibit disbelief of a witness, intentionally or unintentionally." *Id.* at 174.

We also consider the tone and demeanor of the trial judge because jurors "are very prone to follow the slightest indication of bias or prejudice upon the part of the trial judge." *Id.* (quotation marks and citation omitted). The reviewing court should next consider the scope of the judicial intervention within the context of the trial, considering its length and complexity, or any specific issues within the trial. *Id.* at 176. "In a long trial, or one with several complicated issues posed to the jury, for instance, it may be more appropriate for a judge to intervene a greater number of times than in a shorter or more straightforward trial." *Id.* Also, the reviewing court should consider whether, and to what extent, the judge's comments or questions were directed at one side versus the other. *Id.* at 176-177. "Judicial partiality may be exhibited when an imbalance occurs with respect to either the frequency of the intervention or the manner of the conduct." *Id.* at 177. Finally, we will examine whether curative instructions were given to the jury. *Id.*

Starting with the first alleged instance of judicial bias, defendant argues the trial court made a biased statement outside the presence of the jury after the jury asked to review a jail call recording. After ruling on how the court would instruct the jury, the court stated, in relevant part:

> I'm not a juror and I'm not deliberating. I'm not about to direct them to anything more than what they asked.

> This case is not coming back and I am determined that it will not come back. So I am not trying to do anything that is going to make it come back.

> I'm going to follow what they asked.

Defendant argues the trial court's statement about the case "not coming back" indicated the judge felt defendant was guilty and that the court presumed a guilty verdict would be rendered. As an initial matter, this statement occurred outside the presence of the jury and therefore did not affect the jury's view of defendant. See *id.* at 170-171. Additionally, the nature of the court's conduct did not demonstrate the appearance of partiality. The court did not, at any point, express a viewpoint on defendant's guilt or suggest the jury was bound to find defendant guilty. This statement did not demonstrate judicial bias.

Moreover, after reviewing the trial transcripts, we conclude the trial judge did not interrupt the proceeding frequently, did not appear to direct her conduct toward one side over the other, and only asked occasional questions of the witnesses. Next, we address the specific instances of alleged judicial bias defendant discusses in his brief on appeal. First, during the second day of trial, the court interrupted the prosecutor's direct examination of Rogers regarding the day of the victim's murder as follows:

> *Q.* Okay. So continue, the both of you were walking to your car.
>
> *A.* We got in the backyard and she said give me a kiss. And our cars was [sic] parked on the side of each other—
>
> *The Court*: When you say on the side, you mean next to each other?
>
> *The Witness*: Yes—yes.

Second, a short time later, the following exchange occurred:

> *Q.* Do you remember that side street you saw him walking up?
>
> *A.* I want to say it might be Edmore or something. I'm not from over there. I don't know.
>
> *The Court*: Let me ask a question. You say he went back up toward the driveway, is that toward the backyard?
>
> *The Witness*: Yes.

Both of these questions were designed to clarify Rogers's testimony regarding the location of Rogers's vehicle to the victim's vehicle and regarding which direction Rogers saw the shooter move following the shooting. Neither question exhibited bias in favor of the prosecution or antagonism against defendant.

Next, defendant points to two instances in which the court interjected during defense counsel's cross-examination of witnesses regarding the description of the carjacking suspect. First, during defense counsel's cross-examination of Rogers regarding when the victim gave her statement to the police in which she described the carjacking perpetrator, the court interjected as follows:

*Q*.  Okay.  So it's in that order, that's what I'm trying to make sure I understand the order?

*A*.  Yeah, the order I said.

*Q*.  Okay.  So statements at the gas station—

*The Court*: All right.  We've been over that, [defense counsel], three times.  He said statement at the gas station, identified the guy, then they went to the precinct.  Let's move on.

And you don't know whether she gave an identification at the gas station; is that correct?

*The Witness*: She described him a little bit because he ran on her side of the car so she got a good look at him.

*The Court*: But you don't know what she said.

*The Witness*: I don't know exactly what she said.

*The Court*: All right.

*The Witness*: Because I was talking to people—to the police too.

*The Court*: Thank you.

Second, the court interjected during cross-examination of a police officer about the physical description of the carjacking suspect.  In this situation, on cross-examination by defense counsel, an officer testified about notes in his report regarding the description of the carjacking suspect.  The prosecutor objected to a line of questioning on the basis that the question sought an answer which would have constituted hearsay.  The court then questioned the witness as follows:

*The Court*: I'm a little confused first.  Let me make sure.

The description that you just gave us, was that the person that was arrested at the car?

*The Witness*: At the car, yes.

*The Court*: Okay.  Is—so that's different from the description.

So then my question is, you said you didn't ask about a description but one was given to you at the station—I mean, at the BP, right?

*The Witness*: Correct.

*The Court*: All right.  That description is not what you're talking about now, or is it?  Or you're just talking about the person that was arrested?

-13-

*The Witness*: So if I'm following correctly, that the description that was provided to me was the description of the person that had approached the vehicle.

*The Court*: Okay.

*The Witness*: And that was, upon show up [sic] that was the person that was identified as the person and was arrested.

*The Court*: Okay. So—so based on counsel's question when he asked you what did the person look like, you are going by the person that you actually saw that was arrested, correct?

*The Witness*: Correct.

*The Court*: So my question is, you also testified that there was a description given before that person was arrested.

*The Witness*: As the initial description from, uh—that was obtained at about the BP Gas Station.

*The Court*: Yes, that is also in your report.

*The Witness*: That was the male wearing the gray hooded sweatshirt with exposed dreadlock braids from the sweatshirt.

*The Court*: Okay. That was at the BP Gas Station?

*The Witness*: Correct.

*The Court*: Okay.

None of the cited instances exhibit judicial bias. Rather, the court's questions were neutral in nature and designed to clarify the witness testimony about the victim's description of the carjacker. The court was not hostile toward the witness. See *id*. at 175. The court's confusion arose when it was unclear whether certain testimony related to the officer's description of the individual they arrested, or the victim's description of the carjacker. The court's questions were appropriate questions designed to elicit information or clarify the witness testimony, and did not pierce the veil of judicial impartiality. Nor was the court's admonishment to defense counsel that Rogers testified about the same set of facts three times a demonstration of bias or hostility toward counsel. The court was maintaining control over the proceedings and attempting to prevent duplicative testimony.

Next, defendant challenges the trial court's statements toward defense counsel, arguing that the court belittled defense counsel and demonstrated bias against the defense. We again disagree.

Defendant points to statements the court made during defense counsel's cross-examination of a deputy chief assigned to the carjacking case. The exchange was as follows:

*Q*. Do you recall testifying in another matter?

*A*. Yes.

[*Defense Counsel*]: May we approach, your Honor?

*The Court*: Approach about what? Do you have a question for him? What are you asking him?

No, you're not approaching. What are you doing? What are you approaching for?

All you asked him is did he remember testifying in another matter. He said yes.

So what's the next question?

[*Defense Counsel*]: Okay.

*The Court*: The last question you asked him was did he take a statement in the matter. He said he did not.

Is that correct, [Deputy]?

*The Witness*: That's correct.

*The Court*: He said he did not take the statements of them and then you asked him does he remember testifying in another matter. So if you asked—are you asking him something that was asked at another—

[*Defense Counsel*]: Yes.

*The Court*: Then ask the question.

[*Defense Counsel*]: Okay.

The court's discussion about defense counsel's request to approach the witness was not misconduct. While there are occasions that the very nature of the court's words will exhibit bias or hostility, the court's statements as they appear in the transcript did not amount to belittling of counsel. See *Jackson*, 292 Mich App at 599. Additionally, evaluating the totality of the circumstances would support that the court's statement was not biased. The court's interjection was brief, and the court allowed defense counsel to continue his questioning of the witness. See *Stevens*, 498 Mich at 172.

On another occasion, during the cross-examination of another officer involved in the murder investigation, defense counsel asked the officer about the path the shooter may have taken following the shooting. The following exchange occurred regarding the officer's discussion with

a man at the scene (presumably Rogers) about the direction the shooter traveled during and after the shooting:

> *Q*. And where did he describe the shooter coming from?
>
> *A*. From the front of the driveway.
>
> * * *
>
> *Q*. Okay. And did he say what he was doing at that particular time?
>
> *A*. He did not.
>
> *Q*. Did he further describe what happened after—said the person came up from the driveway. Did he indicated to [sic] at what point the person may have gone, how far up the driveway he had gone?
>
> *A*. All the way up the driveway and then into the backyard.
>
> *Q*. And—and did he indicate where the person was when he was shooting?
>
> *A*. He did not.
>
> *Q*. So he described his—the shooter as coming from the sidewalk area going up the driveway shooting at some point and then going out through the backyard?
>
> [*The Prosecutor*]: Objection, that's not what the witness testified to.
>
> [*Defense Counsel*]: Okay.
>
> *The Court*: I'm trying to figure out why this testimony is going on at all.
>
> Anyway, go ahead.

The court's comment indicated the court's confusion about why defense counsel was continuing to question the witness about the path of the shooter when the witness testified that Rogers said the shooter came up the driveway and went into the backyard. Defense counsel suggested the shooter came up the sidewalk area and went up the driveway, which was not what the witness testified was told to her. Under these circumstances, the court's remarks did not demonstrate bias. Also, the court allowed defense counsel to continue his line of questioning. These brief remarks did not amount to belittling of counsel or biased commentary.

Finally, defendant points to another statement by the trial court that occurred during defense counsel's voir dire of Sergeant Skender:

-16-

[*Defense Counsel*]: And I noticed in some of the maps that you had generated that it has, like, two cell phone towers apparently next to each other. Is that something common?

*The Witness*: Yes.

*The Court*: That goes outside of his expertise. Let's stay with that. Questions regarding his training, [defense counsel].

[*Defense Counsel*]: In terms of your training, relatives to [sic] cell phone towers and mapping, the actual map could really vary, that is there could be different things which cause it to be—

*The Court*: You know what, we're not going to do this. Because I listen. I get paid to listen. What you are doing is now trying to back door another question that has nothing to do with his training.

Ask questions regarding his training from T-Mobile, how many hours he's spent, whatever it is. Don't start asking about the mapping because now you are impinging on the People's time.

You have cross-examination. You are only doing the voir dire on his training. Do you have any other questions regarding whether he is qualified to testify in this trial as an expert?

The court's statement did not amount to belittling of counsel or biased commentary in front of the jury. See *id*. at 173-174. When defense counsel asked these questions, the parties were questioning Sergeant Skender about his expertise to allow the court to exercise its gatekeeping function of determining whether Sergeant Skender was qualified to testify as an expert witness. See *Yost*, 278 Mich App at 393; MRE 104(a). Defense counsel's question to the witness did not relate to his qualifications to testify as an expert at trial. Instead, defense counsel was asking specific questions about the map of the cell phone usage on the night of the carjacking. When the court informed defense counsel that his first question went outside the issue of the witness's expertise, defense counsel attempted to ask another version of the same question. At that point, the court admonished defense counsel not to "back door" another question that was unrelated to the expert's training and reminded him that he could ask the expert questions about his report during cross-examination. However, counsel was permitted to continue his voir dire. We do not find the judge's remarks inappropriate.

Moreover, even assuming that some of these remarks were inappropriate, considering each of these isolated statements in the context of the eight-day trial (including five full days of witness testimony), the totality of the circumstances does not reveal that the trial judge harbored a deep-seated antagonism against defendant. Each of the statements was relatively brief when considered in the context of this complex, eight-day jury trial. The court was able to clarify the witness testimony, and the factual background of the case was confusing. Adding to the confusion was the fact that the victim apparently misidentified Dixon as the individual who carjacked her, which prompted the court's several questions about the victim's previous description of the carjacker. It

is unlikely that any of the court's brief interjections or questions to the witnesses would have biased the jury against defendant. It is also noteworthy for purposes of examining the totality of the circumstances that the court's rulings and decisions during trial did not clearly favor the prosecution, and the court made several key evidentiary rulings in favor of defendant, including a ruling precluding the admission of most of Dixon's custodial interview statements.

Because the alleged instances of misconduct were isolated within a lengthy jury trial, the court's curative jury instructions cured any error. See *Stevens*, 498 Mich at 177. Before the jury heard any testimony, the court instructed the jury that the court's role was to make sure the trial was fairly and efficiently run, to decide evidentiary issues, and to instruct the jury on the law. The court explained, "Nothing I say is meant to reflect my own opinions about the facts of the case." Before the jury deliberated, the court instructed the jury not to allow bias or prejudice to influence its decision. The court further instructed the jury, "My comments, rulings, questions, and instructions are not evidence." The court explained that its commentary and instructions were not intended to express an opinion or influence the jury's decision. "Jurors are presumed to follow their instructions, and jury instructions are presumed to cure most errors." *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2021) (quotation marks and citation omitted). Defendant has not overcome the presumption that the instructions cured most errors. See *Stevens*, 498 Mich at 177-178. No structural error occurred.

Affirmed.


/s/ James Robert Redford
/s/ Michael J. Riordan
/s/ Mariam S. Bazzi